HENRIKSEN, J.
On December 23, 2003, the Court held a trial on the cross petitions for modification of custody filed by the parents of almost twelve (12) year old B.T.T. In addition to hearing the testimony of each of the parties, the Court heard very brief testimony from the child’s paternal grandmother, Ba. G. With'the permission of the parties, the Court conducted a private, tape-recorded interview of B.

BACKGROUND

T.L.C. (“mother”) and R.W.T. (“father”) were never married. Mother is presently thirty-three (33) years of age, and father is presently forty-five (45) years of age. They lived together since B.’s birth until they separated somewhere between October and December of 1996.
On January 18, 2002, the parties entered into a Consent Order which basically provided for shared custody and placement.
In December of 2002, mother moved from Kent County to Bear, Delaware. From December of 2002 to early February of 2003, the child lived primarily with father and attended school in the Lake Forest School District.
In February of 2003, father was arrested during a drug raid at his brother’s home. Mother immediately obtained an Emergency Protection From Abuse Order awarding her placement of the child. The PFA application by mother was eventually dropped. However, the child remained with mother and she was enrolled in the Pleasantville Elementary School. The parties entered into an Interim Consent Order on April 2, 2003, which provided primary placement with mother, visitation to father of alternate weekends, every Wednesday evening, and alternate weeks in the summer, as well as requiring father not to use any drugs and also attend counseling.
Both parties filed cross petitions for modification of custody and visitation.

FACTS, LAW, AND REASONING

Pursuant to Title 13, Section 701(a), a father and mother are the joint natural guardians of their minor children, *1086 and are equally charged with their chil-drens’ support, care, nurture, welfare, and education. Where the parents live apart, it falls upon the Court to determine with whom the children shall primarily reside, and to also set forth the schedule of visitation consistent with the childrens’ best interest and maturity, which is designed to permit and encourage the children to have frequent and meaningful contact with both parents.[1] Regardless of who is awarded placement, all parents and other persons are encouraged to foster ... frequent and meaningful contact, in person, by mail and by telephone, between parents and children ...”[2] If the Court finds that this obligation is violated, the Court has the power to remedy this violation by awarding, among other things, extra visitation, a temporary transfer of custody or primary residence, a fine, and even, imprisonment.[3]
In making its decision as to the placement of this child, the Court did not presume that one (1) parent, because of his or her sex, was better qualified than the other parent to act as the primary residential parent.[4]
The Court is required to consider each of the factors set forth in Title 13, Section 722 as well as any other relevant factors the Court may deem appropriate. The Court must consider each factor independently and then give each individual factor “its due weight and importance relative to the other factors in a manner reflecting the best interest of the child in question.”[5] The Court does not adopt a “mechanical or perfunctory approach” whereby each factor is weighed equally, and the child’s best interests are resolved by placing the child with the parent who prevailed on the most factors.[6]
In making its decision on the proper placement for B. the Court considered all relevant factors to determine the best interest of the child, including the following factors set forth in Title 13, Section 722 (a):
Parents’ wishes and residential arrangements: Both parents are seeking primary placement of their daughter. Because father continues to live in Harrington, Delaware, and mother now lives in Bear, Delaware, nearly an hour and fifteen minutes apart, the possibility of shared placement no longer exists.
Father resides in a three (3) bedroom home located in Harrington, Delaware. This was the home in which B. had lived from seven (7) months of age until the parties’ separation in the fall of 1996. No other persons reside in the home. The home is located in the rural downtown area of Harrington.
Father has been employed as a driver since June of 2003. He works five (5) days a week from 7:00 a.m. to 5:00 p.m. However, his hours are flexible. If he gets primary placement of the child, he indicated he will be able to change time for arrival at work to 7:30 a.m. in order that he can be sure B. gets on the school bus.
Mother resides in a rented home in Bear, Delaware. She resides there along with her husband of seven (7) years, S., along with their two (2) children, six (6) year old St. and soon-to-be two (2) year old Sa. Mother and her family began renting *1087 the present residence in Bear two (2) weeks prior to Christmas of 2002. Prior to that, mother and her family resided in a shelter for two (2) weeks in Dover, Delaware because they were homeless. They lived for the three (3) months preceding that in the Dover Inn in Dover, Delaware. Prior to that, mother and her family resided with her father in Dover, Delaware. Before that, the parties rented at West-view Terrace for about a year.
Mother’s husband, S., now works as a truck driver. According to mother, her husband’s job allows him to be home approximately four (4) days every four-and-a-half (4-1/2) months. He is presently taking a vacation for the month of December 2003. Mother projects that S. will soon have some additional flexibility in his job so that he will only be gone two (2) to four (4) weeks at a time.
Mother has a web-based business marketing products and services. She began this in September of 2003 when her husband was on the road. Mother’s web-based business requires her to meet with clients almost nightly, leaving the house at 7:00 p.m. and usually arriving back home by 9:30 p.m. Her youngest child, Sa., goes to sleep at 7:00 p.m. B. is then responsible for putting her six (6) year old sister to bed at 7:30 p.m., and is responsible for watching over her two (2) younger sisters while mother is working.
Child’s wishes: B. very clearly indicated her desire to live primarily with her father. According to B., she does not do anything at her mother’s house except watch over her two (2) younger sisters. In B.’s mind, she is required to do much of the housework in mother’s home.
At father’s home, B. also has chores, but no where near the number of chores as at mother’s house. With father, she is also allowed to take karate lessons, participate in sports and cheerleading, and be with her little dog, Skippy, who B. said she loves dearly.
B. also indicated that, although she likes the Fairwinds Christian School, a private school she now attends, she also likes the Lake Forest school which she attended almost all of her life, and where she has many friends.
B. also indicated that mother has no interaction with extended family members. On mother’s side, B.’s grandmother resides in California. Her stepfather’s mother resides in Dover, Delaware. Her stepfather’s great-grandmother resides in Maine. Her aunt M. resides in Hawaii. Her grandfather lives in Dover, but she seldom sees him. On the other hand, B. described father as having a very close family. She does not see her step-grandfather, who is presently going through a divorce with her maternal grandmother, Ba. G. B. sees her maternal grandmother often. B.’s maternal grandmother resides in Milford, Delaware with father’s sister, P., who B. also sees quite often. B. also identified living in the immediate Harrington, Delaware area her Aunt D. and Uncle K., as well as another uncle who lives in Milford. B. also often sees and enjoys being with her several cousins. B. indicated that father’s extended family often gets together, especially on holidays. Father’s extended family also enjoys a big family vacation together each summer in Ocean City.
The Court was confident that B. fully understood her reasons for wanting to live primarily with father. Although mother felt that B. might be “picking ice cream over apples”, meaning that father was more of a friend to B., and mother was more of a parent, the Court believed that B. had a proper perspective of each of her parents individual situations, as well as *1088 clear reasoning for her choice. In such a case, this child’s wishes should be given great weight in the Court’s decision.[7]
Interaction and interrelationship of child with signifícant others: The Court has already commented how living with father will provide B. with much more significant extended family contacts than living with mother. Mother acknowledged that father has very good family ties and has a close-knit family. Mother also acknowledged that she has minimal, if any, family ties other than the two (2) young children and her husband S., who is seldom there.
Mother also stated that B. never wants to talk to her, and is angry with mother a lot. Although mother believes that B. is angry with her because her mother took B. away from her father because of his drug abuse, the Court notes that B. asked her mother to have her come live with her because of father’s drug use. The Court suspects, therefore, that B.’s anger towards her mother may lie elsewhere. On the other hand, father testified that B. is able to talk to him about most subjects. On subjects B. is unable to talk about with her father, B. tells father’s sister.
Father’s plan for B. during school is that he would take her to the bus at 7:15 a.m. After school, the bus would drop B. off at his sister’s home until he was able to pick B. up. Father would then be home with B. for dinner and the evenings.
Child’s adjustment to home, school and community: Based upon the Court’s interview with B., the Court sees no problem with B. transitioning immediately from her private school at Fairwinds Christian to her old school in Lake Forest. She has been in the Lake Forest School system before, and she will have many of the same friends she had before. Both schools are also at the point where they have concluded their semesters and are about to begin their new semesters. B. told the Court that she would like to transition immediately rather than wait until the end of the school year in June.
Mental and physical health: Both parents and child are in excellent health.
Past and present compliance of both parents with their rights and responsibilities to their child under Title 13, Section 701: Pursuant to Title 13, Section 701, parents are equally charged with their childrens’ support, care, nurture, welfare and education. In addition, as the Court noted at the beginning of this opinion, each parent has the responsibility to encourage their child to have significant and meaningful contact with the other.
The Court was alarmed to hear how mother excessively uses B. to baby-sit B.’s half-sisters so that mother can work in the evenings. Although mother suggested that she is being more of a parent to B. than a friend, the Court is concerned that mother, instead of acting as a parent to a child, has forced B. to become the parent to mother’s other children in mother’s absence. At the same time, mother is robbing B. of her childhood. The Court also learned that when mother travels out-of-state to attend conventions, she takes all three (3) children with her, and B. is required to stay in the room with the younger children while mother is at the convention. This means that mother often is gone during most of the day, occasionally checking in on the children, and not getting back in the room until sometimes as late as 10:00 p.m. Instead of taking B. along with her at the conventions to have an opportunity to sight-see, B. is being used to remain in a *1089 room most of the day to watch over her little sisters.
A parent also has the responsibility to see that their child is encouraged to obtain their education. B. is certainly an intelligent child. The school records, however, indicate that in the first (1st) half of the present school year, B. has either missed or been late nineteen (19) days from school. Mother took the children with her to a convention in Ohio on Friday, October 10, 2003. B. missed that day from school. B. either missed or was late to all of the days for the rest of the week following the convention. Mother also acknowledged that both this year, and last year, mother kept B. home from school to baby-sit the children while mother had to attend Court on February 25, 2003, June 2, 2003, September 27, 2003, and October 24, 2003. Mother also had B. stay home to take care of the youngest child when mother attended a field trip with the older child. On November 24, 2003, mother offered and paid B. twenty dollars ($20) to stay home from school. Mother could not remember the reason why she paid B. to stay home from school. The Court characterizes mother’s willful attitude towards B.’s attendance at school borderline neglect.
Mother also admitted that she does not allow B. to participate in extracurricular activities, such as outside school events, because mother needs B. to watch the younger children. Although the Court congratulates mother in acting to take B. in when father was going through his problems with marijuana, the Court finds almost unbelievable how mother has caused B. to assume the primary responsibilities of parental care for mother’s children and deprive B. of the exciting experiences that such a child should have through the involvement in school and extracurricular activities.
In February of 2003, father was arrested and pled guilty to Possession of Drug Paraphernalia. As father testified, this was a wake up call to him on how marijuana could cause him to lose his child. Father vowed to never use marijuana again. Father satisfactorily attended and completed six (6) months of counseling. B. told the Court that she is no longer worried about her father. She described her father as a changed man. She no longer smells pot on her father nor in the home. B. observed that her father now keeps a cleaner home. Also, her father no longer has the impatience he previously displayed with trains, fights and cars, which would cause him to lose his temper. Even mother conceded that father had changed, and expressed her belief that he would not go back to drugs.
Evidence of domestic violence: Pursuant to Title 13, Section 722(a)(7), the Court is also required to consider evidence of domestic violence as provided for in Chapter 7A of Title 13 Delaware Code. Title 13, Section 703A (a) is as follows:
(a) “Domestic violence” includes but is not limited to physical or sexual abuse or threats of physical or sexual abuse and any other offense against the person committed by 1 parent against the other parent, against any child living in either parent’s home, or against any other adult living in the child’s home. “Domestic violence” does not include reasonable acts of self-defense by 1 parent for self-protection or in order to protect the child from abuse or threats of abuse by the other parent or other adults living in the child’s home.
Pursuant to Title 13, Section 706A, the Court is required to consider any evidence of a past or present act of domestic violence in custody and residential living ar *1090 rangements for a child, and is further required to make specific written findings in support of any decision which would award custody or primary residence to a party who has committed acts of domestic violence as previously defined.
The only suggestion of possible domestic violence was demonstrated through a photograph taken of B.’s buttocks on August 17, 2000. The photograph reflects a bruise which was admittedly caused when B. was spanked with a leather belt by her stepfather. At the time, B. would have been eight-and-a-half (8-1/2) years old. There was not enough evidence placed into the record for the Court to determine whether or not the force used on B. was excessive. However, the force clearly left a bruise. The allegations of domestic violence in this case, or the lack of them, did not form a basis for the Court’s decision.

CONCLUSION AND ORDER THEREON

Based upon all of the foregoing, the Court finds it in the best interests of the child for the parents to share joint custody, but with primary placement with father. Although father had a problem with marijuana at one time, it appears that he has overcome this problem to his own satisfaction, his daughter’s satisfaction, and even mother’s satisfaction. Father’s living circumstances have remained consistent and stable over the years; whereas, mother has moved many times and lived in some very transient situations. Because of father’s work and hours he maintains, B. will be able to spend time with her father which will include time where he sees that she attends extracurricular events which a child should enjoy, such as karate and cheerleading. Mother, on the other hand, has stifled B.’s chances to truly enjoy her childhood. Mother has excessively used B. as a babysitter for mother’s younger children. Also, by living with father, B. will be surrounded by extended family members who love and care for her. Mother, on the other hand, seems to be surrounded solely by two (2) young children for whom B. was required to provide care on a regular basis. Because both school systems are at a time of transition, and because B. is familiar with the Lake Forest School system and the friends she will have in that school system, the Court also believes that placement with father should occur immediately.
Accordingly,
IT IS HEREBY ORDERED:
1. The prior Order of Custody and Visitation of this Court is hereby modified such that the parties shall share joint custody, and father shall have primary placement.
2. B. shall be with mother from the date of this Order until 6:00 p.m. Friday, January 2, 2004, when the child shall then go to live primarily with father.
3. Thereafter, mother’s visitation shall be according to the standard guideline visitation of the Court, with certain modifications, all of which are more fully set forth in the visitation guidelines attached hereto and made a part hereof.
IT IS SO ORDERED.

. Tit. 13, Section 728(a).

. Tit. 13, Section 728(b).

. Ibid.

. Tit. 13, Section 722(b).

. Holmes v. Wooley, Del.Supr., 2002 WL 27436, Holland, J., Berger, J. and Steele, J. (Jan. 3, 2002).

. Ibid.

. William H.Y. v. Myrna L.Y., 450 A.2d 406 (1982).